IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

EDWARD BRASLEY, et al., )
)    Case No.  CV-08-173-S-BLW
Plaintiffs, )
)    **FINDINGS OF FACT,**
v. )    **CONCLUSIONS OF LAW**
)    **AND ORDER**
FEARLESS FARRIS SERVICE )
STATIONS, INC., et al., )
)
Defendants. )
_____ )

## INTRODUCTION

The Court conducted a bench trial in this matter on January 4-5, 2010.  The

parties then submitted their post-trial briefs.  The Court now enters its Findings of

Fact, Conclusions of Law and Order.

## FINDINGS OF FACT

### Background

1.    Prior to November 18, 2002, Fearless Farris Service Stations, Inc.

("Fearless") was owned by Farris S. Lind, Kent Lind and H. Kent Johnson

("Lind/Johnson").

2.    Sometime in the 1980s, Fearless established a retirement plan, referred to as

the Fearless Farris Service Stations, Inc. Deferred Compensation Plan (the

"Plan").

3.   The only documents evidencing the Plan were certain letters and memoranda

distributed to Plan participants over the years, or in some cases placed in

company files.

4.   According to these letters and memoranda, the Plan underwent several

changes over the years, with a final written version on December 19, 1995.

(Joint Ex. No. 4.)

5.   The December 19, 1995 version includes the words "Summary and Revision

of the Plan" in the reference line. (Joint Ex. No. 4.)

6.   The December 19, 1995 Summary and Revision of the Plan explained that

Fearless was implementing the following revised policy:

a.   The Plan "will pay to the qualified employee or his surviving

beneficiary, upon reaching the retirement age of 65 and having

completed a minimum of 20 years of service to the Company, a

monthly sum of 25% of the average of his/her last 5 years of service

for a period of 15 years. In the case of an employee pre-deceasing the

retirement age of 65 years, but still meeting the 20 year service

requirement, the Company will pay to the surviving beneficiary 50%

**Findings of Fact and Conclusions of Law and Order - 2**

of the employee's last 5-year average income, paid monthly for 15 years." (Joint Ex. No. 4.)

b.      It went on to state that the new Plan "addresses events that may occur in either early retirement or if the length of service is not the full 20 years required by the Plan." (Joint Ex. No. 4.)

c.      A second page was attached to the letter which generally described by example how a participant would qualify for benefits and how benefits in the form of retirement pay would be determined under the Plan. (Joint Ex. No. 4.)

7.      The former owners of Fearless purchased whole life insurance policies on the lives of participants in the Plan.

8.      Fearless paid the premiums on those policies and those policies accumulated a cash surrender value.

9.      Fearless was the beneficiary and owner of the insurance policies at all times.

10.     At one point, in the late 1990's or the year 2000, the insurance policies then existing on the lives of most Plan participants were pledged as collateral by Fearless for its operating line of credit with Wells Fargo Bank.

11.     Sometime during 1998-2000, Fearless stopped making premium payments on the policies, allowing the cash surrender value and earnings on the

**Findings of Fact and Conclusions of Law and Order - 3**

policies to pay the premiums.

12.     On November 18, 2002, certain purchasing entities formed by Defendants

Charley Jones and Shawn Davis ("Jones/Davis") purchased the common

stock and assets of Fearless Farris Service Stations, Inc., Fearless Farris

Wholesale, Inc., and their various subsidiary entities.

13.     As a result of the purchase agreement, Jones/Davis became the sole

shareholders and owners of Fearless and its subsidiaries.

14.     All of the whole life insurance policies remained assets of Fearless except

the policies of the three original owners, Kent Johnson, Scott Lind and Kent

Lind.

15.     Within the Stock and Asset Purchase Agreement, Schedule 4.23 identified

the then thirty participants in the Plan and referred to them as follows:

a.     "The following employees are participants in a non-qualified Deferred

Compensation (Retirement) Plan Adopted and Revised December 19,

1995." (Joint Ex. No.3.)

16.     Charley Jones is a certified public accountant by education, practiced public

accounting for a period of time following graduation from college, and was a

corporate officer of Stein Distributing Company before he and Davis

purchased Fearless.

**Findings of Fact and Conclusions of Law and Order - 4**

17.   While employed with Stein Distributing Company, Jones had experience
      with what he believed was a deferred compensation plan similar to the
      Fearless Plan.

18.   Jones testified that he originally believed that both the Fearless Plan and the
      Stein plan were non-qualified plans which were, in essence, "golden
      handcuffs" plans for a small number of employees.

19.   At the time they purchased Fearless, Jones/Davis paid Wells Fargo Bank to
      release its security interest in the insurance policies.

20.   Shortly following their purchase of Fearless, Jones/Davis also discovered
      that various unpaid expenses of Fearless existed, which were contrary to the
      accounting records provided by Fearless prior to the sale.

21.   Jones testified that there were insufficient funds to pay the expenses when he
      and Davis bought Fearless, and it was necessary for Fearless to take out an
      additional line of credit to pay them.

22.   Jones/Davis liquidated many of the life insurance policies for their cash
      surrender value and paid that amount toward the line of credit.

23.   Jones/Davis retained the insurance policy of Loren Pratt, who was terminally
      ill.  They received a pay out on that policy when Mr. Pratt died.

24.   Jones and Davis later discussed the Plan and concluded they could terminate

**Findings of Fact and Conclusions of Law and Order - 5**

it, at least as to some participants.

25. In two group meetings, Jones advised the Plan participants of the decision to terminate the Plan effective July 22, 2003.

26. Jones provided the meeting attendees with a memorandum stating that the "Plan is terminated effective 7/22/03." (Joint Ex. No. 6.)

27. The memorandum further stated that "[t]he Company will make every effort to pay benefits to existing retirees and those close to retirement (within five years). This commitment will stretch the financial resources of the Company and will only be fulfilled if the Company prospers in the long term." (Joint Ex. No. 6.) It went on to state that "[i]f future financial conditions require it, those payments may be suspended or terminated." (Joint Ex. No. 6.)

28. The memorandum also stated that "[t]he company has no financial obligation to you as a result of the plan termination." (Joint Ex. No. 6.)

29. Plaintiffs Brasley, Wayment and Newell attended the July 23, 2003, meeting.

30. Each of the participants attending the meeting acknowledged receipt of the memorandum by signing an acknowledgment page.

31. Plaintiff Elliott did not attend the meeting because he had been terminated from Fearless a few weeks earlier.

**Findings of Fact and Conclusions of Law and Order - 6**

32.    At the time the memorandum was distributed, one retired Plan participant

had already begun receiving monthly benefits under the Plan, which

payments have continued.

33.    After the July 2003 meeting, four additional Plan participants who retired

later in 2003 and 2004, and had reached age 65, began and have continued to

receive monthly retirement benefits under the terms of the Plan.

34.    All of these benefit payments have been made from the general funds of

Fearless.

35.    To date, Fearless has paid approximately $560,000 to Plan participants in the

form of monthly retirement payments or by way of lump sum settlement

payments, all of which have been made from the general funds of the

company.

36.    In approximately June 2007, Fearless and its subsidiary entities were merged

into Stinker Stores, Inc. ("Stinker").

37.    Stinker is a successor to Fearless and all above-referenced benefit payments

or settlements have been subsequently made from the general funds of

Stinker.

**Roberts Case**

38.    In an earlier, related case, one of the Plan participants, Ted Roberts, sued

Lind/Johnson, Jones/Davis and Fearless in this Court.

39.  Ted Roberts was a Plan participant whose benefits Fearless intended to terminate pursuant to the July 22, 2003 memorandum.

40.  Roberts was terminated as an employee from the Company in August 2003.

41.  The case – *Roberts v. Fearless Farris Service Stations, Inc.*, CV-05-472-S-WFN ("Roberts Case") – was handled by Judge William F. Nielson from the Eastern District of Washington, sitting by designation.

42.  In his law suit, Roberts alleged that the Plan was subject to ERISA requirements, that Roberts was entitled to benefits under the Plan, and that Fearless and the current and former owners were liable for either a lump sum distribution of early retirement benefits or an order compelling the defendants to establish and fund the means to provide Roberts with full retirement benefits under the Plan.

43.  The Court concluded that the Plan was subject to ERISA.

44.  The Court also concluded that Fearless, Lind/Johnson and Jones/Davis were all fiduciaries under the Plan, and that all breached their fiduciary duties to follow ERISA requirements for the Plan.

45.  However, the Court determined that although Lind/Johnson breached their fiduciary duties by failing to follow ERISA requirements in creation and

maintenance of the Plan, no damages arose from their breach.

46.  Therefore, Lind/Johnson were not held liable for any damages resulting from their breach of fiduciary duties.

47.  The Court concluded that Jones/Davis and Fearless were the liable parties.

48.  The matter was appealed to the Ninth Circuit, but the parties settled the case during mediation before the Ninth Circuit issued a decision.

49.  In an earlier Memorandum Decision and Order, this Court determined that Judge Nielsen's findings of fact and conclusions of law in the Roberts Case have a preclusive effect in this matter to the extent Judge Nielsen made determinations generally applicable to the Plan.

50.  Relevant binding findings of fact and conclusions of law from that case include the following:

   a.  The Plan was not a "Top-Hat" plan, which is a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employed." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

   b.  Because the Plan is not a "Top-Hat" plan, it is subject to the substantive requirements under ERISA. For example, once an

**Findings of Fact and Conclusions of Law and Order - 9**

employee satisfies 7 years of service, their right to their normal retirement benefit is nonforfeitable. 29 U.S.C. § 1053(a)(2)(A)(iii). Consequently, the Plan could not be terminated as to those participants who as of July 2003 had not yet reached retirement or early retirement age and who otherwise have met the requirements under the Plan for payment of benefits.

c.   Stinker (formerly Fearless), Charley Jones and Shawn Davis are fiduciaries under the Plan.

## Current Litigation

51.   On April 17, 2008, Plaintiff Edward Brasley filed the Complaint in this case against Defendants Fearless, Westpoint Transportation, Inc., the Plan, Charley Jones, and Shawn Davis.

52.   On September 8, 2008, Plaintiff filed a First Amended Class Action Complaint, adding four additional individual Plaintiffs, Todd Wayment, Vernon Elliott, Katherine Ryan, and Betty Newell.

53.   Plaintiffs never actually sought class certification.

54.   The Amended Complaint also added Stinker as a named Defendant.

55.   Plaintiff Katherine Ryan's claims were subsequently settled out of court.

56.   The remaining named Plaintiffs assert that Defendants breached their

fiduciary duties under the Plan.

57.     Plaintiffs seek equitable relief granting them their benefits under the Plan.

58.     Plaintiffs also assert a claim for statutory penalties under ERISA for Defendants' alleged failure to provide information, including a summary plan description, a summary annual report, and a participant benefit statement under the Plan.

59.     The parties spent significant time during this litigation trying to reach agreement on a remedy.

60.     In December 2009, Defendants requested IRS approval of an ERISA qualified plan to establish certain benefits to all remaining eligible plan participants.  (Joint Ex. No. 1.)

61.     The IRS has not yet responded to that request.

62.     The new plan is entitled The Fearless Farris Wholesale Deferred Compensation Plan and Trust ("Wholesale Plan") (Joint Ex. No. 2.)

63.     Plaintiffs and/or their attorneys participated in the preparation of the Wholesale Plan.

64.     Plaintiffs agree with much of the Wholesale Plan, but request some revisions.

65.     Plaintiffs and Defendants both favor the profit sharing plan as the

appropriate means for paying the benefits promised under the Plan because it has tax advantages for both parties.

66.    The Wholesale Plan includes Plan participants who are still employed with Fearless, as well as participants who are not.

## Betty Newell

67.    Plaintiff Betty Newell is one of the named Plaintiffs.

68.    Newell graduated from high school in 1959.

69.    Newell attended classes at the College of Idaho in 1960 and 1961.

70.    Prior to working at Fearless, Newell took accounting courses at Boise State University in approximately 1982.

71.    Before her employment with Fearless, Newell worked as a bookkeeper for several businesses, including former Idaho Governor Phil Batt's farming businesses, a nightclub in Orofino, Idaho, and a construction company.

72.    Newell was also a licensed real estate agent with Coldwell Banker from approximately 1984 to 1992.

73.    Newell also worked in accounting for Mackey Bar Corporation prior to working at Fearless.

74.    Newell began working at Fearless in December 1993 as the payroll supervisor for the company and its related entities.

**Findings of Fact and Conclusions of Law and Order - 12**

75.    While employed at Fearless, Newell was the payroll supervisor for
       approximately 500 employees.

76.    In that capacity, Newell was responsible for payroll calculations for various
       fringe benefits at Fearless.

77.    Newell became a participant in the Plan in December 1996, with retroactive
       eligibility to her date of hire in December 1993.

78.    When Newell became a participant in the Plan, she received and signed the
       December 19, 1995 Summary and Revision of the Plan. (Joint Ex. No. 4.)

79.    After signing the Summary and Revision of the Plan, Newell never received
       any quarterly, annual or other plan descriptions, statements or reports.

80.    In early summer 2003, Jones and Davis decided to terminate Newell and
       outsource the payroll functions of Fearless.

81.    At that time, Newell was 62 years old and eligible for early retirement under
       the Plan.

82.    On July 14, 2003, Jones met with Newell in his office where he informed her
       of the decision to terminate her and outsource payroll functions.

83.    Newell agreed to stay on with Fearless for approximately six additional
       weeks to help with the payroll transition.

84.    Newell knew that she was eligible for early retirement benefits under the

Plan.

85.   However, Jones told Newell that he was eliminating the retirement program.
      Specifically, he stated that retirees receiving benefits at that point probably
      would not be receiving benefits within the next two to three years because
      the company could not afford the retirement program.

86.   On July 18, 2003, Jones again met with Newell regarding her termination
      and the terms for her continued employment for the next several weeks.

87.   Jones offered Newell a one-time lump sum payment of $30,000.00 in lieu of
      her retirement benefits.

88.   Jones also provided Newell with a Memorandum regarding "Separation
      Package." (Joint Ex. No. 10)

89.   The Separation Package stated, in part, that "Employer has offered to pay, as
      a special separation allowance incidental to your termination, the gross
      amount of $30,000.00 if you sign and return this document within the time
      noted."  (Joint Ex. No. 10)

90.   Newell understood that the $30,000.00 lump sum payment was in lieu of
      receiving monthly retirement payments.

91.   The Separation Package also included "Release and Waiver" language,
      which stated in relevant part as follows:

**Findings of Fact and Conclusions of Law and Order - 14**

a.     In exchange for payment of the separation allowance described above

. . . I hereby knowingly, willfully, irrevocably and unconditionally

release, acquit and forever discharge and release Fearless Farris

Service Stations, Inc. and each of its officers, directors, agents,

assigns, and all other persons acting by or through Fearless Farris

Service Stations, inc., from any claims for additional compensation,

severance or benefits in any form or damages, or for personal injuries

or attorneys' fees.  This Release specifically includes, but is not

limited to, all claims for relief or remedy under any common law

theories against Fearless Farris Service Stations, Inc., including, but

not limited to, breach of contract or tort or tort-like theories and under

any local, state or federal civil rights, labor and employment laws

including, but not limited to, the Employee Retirement Income

Security Act (ERISA). . . ." (Joint Ex. No. 10.)

92.     The Separation Package gave Newell 21 days from the date of the agreement

to accept the terms of the agreement, and an additional 7 days to revoke the

acceptance.

93.     The Separation Agreement stated that the undersigned understood and

acknowledged that she had the right to and was encouraged to consult an

**Findings of Fact and Conclusions of Law and Order - 15**

attorney before executing the document.

94.    Newell testified that she knew she had the right to consult an attorney, but

elected not to do so.

95.    The Separation Agreement is signed by Newell and dated July 22, 2003.

96.    On July 22, 2003, Newell attended the Plan participant meeting conducted

by Jones, where he advised the participants of the Plan termination.

97.    On July 31, 2003, following the 7-day waiting period as provided in the

Separation Agreement, Newell received the $30,000.00, less a FICA tax

deduction in the amount of $1,860.00, and FICA-Medicare deductions in the

amount of $435.00.

98.    Newell did not attempt to rescind the agreement during the 7-day waiting

period.

**Vernon Elliott**

99.    Vernon Elliott is one of the named Plaintiffs.

100.    Elliott graduated from high school in 1964, and took economics,

salesmanship and human relations classes at community colleges.

101.    Elliott worked various jobs prior to his employment with Fearless.

102.    Among others, he was the store manager for P.N. Hirsch & Company, which

was part of the International Shoe Company, where he was a participant in a

**Findings of Fact and Conclusions of Law and Order - 16**

small retirement plan.

103.   Elliott joined Fearless as a fleet card sales representative in October 1995.

104.   Elliott became a participant in the Plan in October 1998.

105.   At that time he received and signed a copy of the December 19, 1995

Summary and Revision of the Plan.

106.   Fearless terminated Elliott in June 2003.

107.   At the time of his termination, Elliott was 57 years old.

108.   Elliott will turn 65 in March 2011.

109.   On February 3, 2005, Elliott filed a separate lawsuit against Fearless in this

Court alleging age discrimination.

110.   On July 8, 2005, Elliott and his attorney served his initial disclosures on the

defendants in the discrimination case.

111.   The initial disclosures stated, in part, that Elliott "will be filing a separate

ERISA claim for his unpaid retirement benefits. His expert witness on

damages will be Dr. Richard A. Slaughter, Ph.D., of Boise, Idaho." (Joint

Ex. No. 17.)

112.   Moments before Elliott's deposition was to be conducted in the

discrimination case, Jones asked if he could meet with him privately.

113.   Elliott agreed and the two met without attorneys.

**Findings of Fact and Conclusions of Law and Order - 17**

114.  During the meeting Jones offered Elliott $3,000.00 to settle the case.

115.  After consulting with his attorney, Elliott agreed to the settlement.

116.  Fearless' attorney prepared a Confidential Settlement and Release Agreement and presented it to Elliott and his attorney. (Joint Ex. No. 15.)

117.  On January 9, 2006, Elliott signed the Confidential Settlement Agreement and Release.

118.  The Settlement Agreement and Release provides in relevant part as follows:

   a.  "Elliott knowingly and voluntarily releases, discharges and waives all causes of action or claims he may have or have had against Fearless Farris Service, or its subsidiaries, affiliates, successors, officers, directors, mangers, insurers, owners, legal representatives, estates, agents, heirs, assigns, servants, employees and former employees, including without limitation any claim under . . . the Employee Retirement Income Security Act, 29 U.S.C. § 1101, et seq."  (Joint Ex. No. 15.)

119.  The Settlement Agreement and Release language allowed Elliott 21 days to consider the Agreement, and an additional 7 days to revoke the agreement after its execution.

120.  Elliott did not revoke the agreement within the 7-day period, and at the

expiration of that period, Fearless paid Elliott $3,000.00.

## CONCLUSIONS OF LAW

### Release Agreements

1.     Defendants contend that the release agreements signed by Newell and Elliott

preclude them from asserting their ERISA claims.

2.     Newell and Elliott counter that the agreements are unenforceable pursuant to

ERISA § 410(a) (29 U.S.C. § 1110(a)).

3.     As explained in the Court's earlier Memorandum Decision and Order on

summary judgment, and as still true today, neither the parties nor the Court

could locate a Supreme Court or Ninth Circuit case specifically addressing

this issue.

4.     However, as also stated by the Court in its earlier decision, in *Leavitt v.*

*Northwestern Bell Telephone Co.*, 921 F.2d 160, 161 (8th Cir. 1990), the

Eighth Circuit directly addressed the question of whether ERISA § 410(a)

(29 U.S.C. § 1110(a)) applies to void release agreements like those signed

by Newell and Elliott.[1]

5.     In *Leavitt*, the plaintiff signed a release with his former employer, Bell

---

[1] In dicta, the Ninth Circuit referenced *Leavitt* as an example of courts considering whether a mistaken waiver must withstand special scrutiny designed to prevent employer or fiduciary abuse.  *Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1012 (9th Cir. 1997).

Telephone, in exchange for $15,000, which was less than he would have received under his ERISA-covered plan.  *Leavitt*, 921 F.2d at 161.

6.   Bell Telephone argued that the release discharged the company from any liability.

7.   The district court granted summary judgment in favor of Bell Telephone, and the plaintiff appealed.

8.   On appeal, the Eighth Circuit considered whether ERISA § 410(a) (29 U.S.C. § 1110(a)) bars private releases of statutory claims.

9.   The applicable language in ERISA § 410(a) (29 U.S.C. § 1110(a)) states that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under [the fiduciary responsibility sections of ERISA] shall be void as against public policy."

10.   The Eighth Circuit concluded that "a release is not an 'agreement or instrument' within the meaning of [ERISA § 410(a)] section 1110(a)." *Leavitt*, 921 F.2d at 161.

11.   The court explained that ERISA § 410(a) (29 U.S.C. § 1110(a)) prohibits agreements which diminish the statutory obligations of a fiduciary, but a release "does not relieve a fiduciary of any responsibility, obligation, or duty

imposed by ERISA" *Id*. at 161-62.

12.  Rather, a release simply settles a dispute "that a fiduciary did not fulfill its responsibility or duty on a given occasion." *Id*. at 162.

13.  Notably, the Eighth Circuit explained that to hold otherwise would amount to required, protracted litigation whenever there is a claim for breach of fiduciary duty under ERISA. *Id*.

14.  Moreover, the Eighth Circuit explained that settlement of a breach of fiduciary duty claim under ERISA need not be supervised by courts, given the general knowledge base of most employees covered by ERISA.

15.  However, the *Leavitt* court also explained that even if ERISA § 410(a) (29 U.S.C. § 1110(a)) does not bar private releases of statutory claims, the court must determine whether a release is enforceable. *Id*. at 161. "A fiduciary and a beneficiary can settle a disputed claim that the fiduciary breached its fiduciary responsibilities under ERISA if the claim is knowingly and voluntarily released." *Id*. at 162.

16.  General principles of contract construction are used to determine whether a release is knowing and voluntary. *Id*.

17.  Because principles of trust law guide the decision, the court "must examine the totality of the circumstances in which the release was signed to ensure

the fiduciary did not obtain the release in violation of its duties to the

beneficiary." *Id*.

18.   In applying these principles, the court should consider the following:

a.   (1) [the beneficiary's] education and business experience; (2) [the

beneficiary's] input in negotiating the terms of the settlement; (3) the

clarity of the release language; (4) the amount of time [the

beneficiary] had for deliberation before signing the release; (5)

whether [the beneficiary] read the release and considered its terms

before signing it; (6) whether [the beneficiary] knew of his rights

under the plan and the relevant facts when he signed the release; (7)

whether [the beneficiary] was given an opportunity to consult with an

attorney before signing the release; (8) whether [the beneficiary]

received adequate consideration for the release; and (9) whether [the

beneficiary's] release was induced by improper conduct on [the

fiduciary's] part. *Id*.

19.   As this Court explained in its earlier decision, some of these factors, when

applied to the undisputed facts in this case, support a finding of a valid

release for both Newell and Elliott.

20.   For example, each release specifically states that the beneficiary releases and

**Findings of Fact and Conclusions of Law and Order - 22**

waives all causes of action against Fearless, including ERISA claims.

21.   Moreover, each beneficiary had 21 days to consider the release and 7 additional days to revoke acceptance of it.

22.   Newell and Elliott each read and signed their respective releases.

23.   Finally, Elliott was represented by his attorney, and Newell was encouraged to consult with an attorney.

24.   The trial testimony did nothing to change these findings; rather, trial testimony further supports these findings.

25.   However, as the Court also explained in its earlier opinion, other factors were not as clear and could not be resolved against Elliott and Newell in the context of a summary judgment motion.

26.   One of those factors was the extent of Newell's and Elliott's education and business experience.

27.   As explained in the Findings of Fact above, trial testimony reveals that neither Newell nor Elliott had extensive or complex education or business experience related to law, contracts or retirement plans.  Neither had the type of experience which would suggest that they were well versed in ERISA law, retirement programs or general contract law.

28.   Trial testimony also addressed the other remaining factors, such as Newell's

**Findings of Fact and Conclusions of Law and Order - 23**

and Elliott's input in negotiating the terms of their releases, their knowledge

of their rights under the Plan when they signed the releases, and whether the

releases were induced by improper conduct on the part of Fearless.

**Newell**

29.    With respect to Newell, she testified that she knew of her rights under the

Plan, and she knew that her acceptance of the $30,000.00 was in lieu of her

retirement benefits.

30.    Notably, however, Jones improperly told Newell that the company would

probably discontinue retirement payments altogether within 2-3 years, which

is when Newell would become eligible for her full retirements benefits.

31.    Jones disputed the truthfulness of this statement, or at least the degree to

which he intimated that Fearless would likely discontinue paying benefits.

32.    However, in the context of the other evidence presented at trial, such as the

July 22, 2003 Plan termination letter to Plan participants, the Court finds

Newell's testimony more believable.

33.    At best, the July 22, 2003 Plan termination notice only suggested, but

certainly did not promise, that the company would pay retirement benefits to

someone in Newell's position.

34.    The notice only stated that Fearless "would make every effort" to pay

**Findings of Fact and Conclusions of Law and Order - 24**

someone in Newell's position.  (Joint Ex. No. 6.)

35.  It further stated that "[i]f future financial conditions require it, those payments may be suspended or eliminated."  (Joint Ex. No. 6.)

36.  Moreover, having sat through all the testimony in this matter, Newell's general demeanor and presentation of what transpired during her meeting with Jones was more believable than that of Jones.

37.  Accordingly, the testimony and evidence support a conclusion that Newell's release was induced by improper conduct on the part of Jones.

38.  Moreover, ERISA requires that fiduciaries furnish participants and beneficiaries with summary plan descriptions "in a manner calculated to be understood by the average plan participant . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a); see also 29 U.S.C. §§ 1021 and 1024.

39.  The evidence at trial revealed that no such notices were ever given to any of the Plan participants, including Newell.

40.  Finally, evidence at trial revealed that Newell's retirement benefits would likely have been much higher than the $30,000.00 she received.

41.  Under these circumstances, the Court concludes that although some of the

**Findings of Fact and Conclusions of Law and Order - 25**

factors weigh in favor of finding Newell's release valid, the more significant

factors weigh in favor of invalidating the release.

42.    Most important is the improper conduct on the part of Jones.   At the very

least, he strongly suggested to Newell that she would not receive her

retirement benefits, even if she turned down the $30,000.00 offered in

settlement.

43.    Of all the factors, it is clear that this improper and inaccurate statement

played a critical role in Newell's decision to take the money and release

Fearless from its obligations under the Plan.

44.    Thus, Fearless obtained Newell's release in violation of its fiduciary duties.

45.    Accordingly, Newell did not knowingly and voluntarily sign the release, and

her claims do not fail because of the release agreement.

46.    However, Newell's benefits under the Plan will need to be offset by the

$30,000.00 she received in lieu of her benefits.

47.    The parties should work together on how to calculate that offset, which may

include adjustments for the time-value of money.  If they cannot reach

agreement, the Court will entertain a separate motion on the issue.

**Elliott**

48.    With respect to Elliott, two important facts warrant a different conclusion

from the one reached for Newell.

49.   First, Jones did not have a discussion with Elliott, as he did with Newell, wherein he essentially stated that the Plan would not survive in the future.

50.   Second, and more importantly, Elliott knew that he had an ERISA claim before he signed his release agreement.

51.   In his initial disclosures provided to Fearless in his wrongful termination case, Elliott stated that he would be filing "a separate ERISA claim for his unpaid retirement benefits."  (Joint Ex. No. 17.)

52.   The initial disclosures were dated July 2005.

53.   He signed his release, which explicitly released Fearless from any ERISA claims, in January 2006, after he had stated that he intended to file an ERISA claim against Fearless.

54.   The Court recognizes that Newell's release also explicitly released Fearless from any ERISA claims.  The critical difference, however, is that Newell had been directly misled by Jones regarding the Plan and had no idea she had an ERISA claim when she signed her release; whereas, Elliott had not been directly misled by Jones regarding the Plan and had specifically stated that he believed he had an ERISA claim against Fearless.

55.   Under these circumstances, the Court finds that Elliott's release was not

induced by the fiduciary's improper conduct.

56.    Therefore, the bulk of the factors weigh in favor of finding Elliott's release

valid.

57.    Accordingly, the Court concludes that Elliott knowingly and voluntarily

waived his ERISA claims against Defendants, and his claims will be

dismissed.

**Plaintiffs Represent the Plan and Plan Participants**

58.    ERISA Section 502(a)(2) (29 U.S.C. § 1132(a)(2)) states that a Plan

participant may bring suit against the fiduciaries on behalf of the Plan.

59.    Section 502(a)(2) (29 U.S.C. § 1132(a)(2)) states that an action may be

brought by a participant "for  appropriate relief under section 409."

60.    Section 409 (29 U.S.C. § 1109) states as follows:

a.    "Any person who is a fiduciary with respect to a plan who breaches

any of the responsibilities, obligations, or duties imposed upon

fiduciaries by this title shall be personally liable to make good to such

plan any losses to the plan resulting from each such breach, and to

restore to such plan any profits of such fiduciary which have been

made through use of assets of the plan by the fiduciary, and shall be

subject to such other equitable or remedial relief as the court may

deem appropriate, including removal of such fiduciary."

61. ERISA authorizes injunctive and appropriate equitable relief. *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993); ERISA Section 409 (29 U.S.C. § 1109); ERISA Section 502(a)(2) (29 U.S.C. § 1132(a)(2)).

62. Defendants concede that the eligible participants are entitled to the benefits provided in the Plan.

63. However, Defendants contend that Plaintiffs did not pursue a claim on behalf of the Plan, and that the Court need not enter a ruling or judgment that the named Plaintiffs pursued claims against Defendants in a representative capacity.

64. The Court disagrees.

65. As explained above, Section 502(a)(2) gives a participant the right to bring suit on behalf of the Plan.

66. Notably, the Wholesale Plan, which was submitted to the IRS by Defendants, includes as participants all individuals (except potentially Newell and Elliott because of the release agreement issue) from the Plan for whom Plaintiffs seek to represent.

67. Thus, to suggest that the named Plaintiffs do not represent the Plan and its participants is nonsensical, and could fly in the face of judicial economy

**Findings of Fact and Conclusions of Law and Order - 29**

should the other participants need to resort to litigation to protect their rights under the Plan.

68. Further, the actions of the named plaintiffs, and counsel for the named plaintiffs, indicate that they have sought relief for all participants of the Plan in this matter.

69. Accordingly, the Court concludes that the named Plaintiffs represent the Plan and Plan participants pursuant to Section 502(a)(2).

70. Moreover, as determined in the Roberts Case, the Court concludes that Defendants Fearless, Stinker, Jones and Davis are fiduciaries to the Plan and Plan participants.

71. The Court also concludes that Defendants Fearless, Stinker, Jones and Davis breached their fiduciary duty to the Plan and Plan participants by not complying with ERISA.

## Funding the Wholesale Plan

72. ERISA Sections 301-303 (29 U.S.C. §§ 1081-1083) provide that plans are to be funded from their inception, which in this case would have been sometime in the 1980s.

73. Section 302(a) (29 U.S.C. § 1082(a)) specifically states that "in the case of a defined benefit plan which is a single-employer plan, the employer makes

Findings of Fact and Conclusions of Law and Order - 30

contributions to or under the plan for the plan year which, in the aggregate, are not less than the minimum required contribution determined under section 303 of this title for the plan for the plan year."

74. The Plan is a defined benefit plan as defined by ERISA Section 3(35) (29 U.S.C. § 1002(35)).

75. The purpose of ERISA is to provide a level of assurance to employees that funds will be available to pay their retirement benefits.

76. The Wholesale Plan, which has been forwarded to the IRS for approval as a qualified plan, includes trust provisions which the parties agree will assist in providing the security required by ERISA and to which the Plan participants are entitled.

77. However, that security is not yet established because Defendants have not activated the Trust.

78. Defined benefit plans are required to achieve certain funding levels to ensure that promised benefits can be paid to the participants.  ERISA §§ 301, 302, and 303 (29 U.S.C. §§ 1081, 1082, and 1083).

79. Defendants have submitted a VCP application and the Wholesale Plan to the IRS under the EPCRS program (Joint Ex. Nos. 1 &2.)

80. Under the IRS EPCRS program, the IRS and affected parties negotiate a

**Findings of Fact and Conclusions of Law and Order - 31**

correction to place the participants in the position they would have been in if the failure had not occurred. Rev. Proc. 2008-50, Section 6.02(1).

81.     Plaintiffs therefore ask the Court to order Defendants to fund the Wholesale Plan in full immediately, or in five annual substantially equal installments providing for funding of all Wholesale Plan benefits no later than March 1, 2014 (plus such additional amounts as required to address future accruals).

82.     In the VCP Application to the IRS, under the last full paragraph of page 4, Defendants agree to funding over a three to five year period from the date of implementation of the Plan. (Joint Ex. No. 1.).

83.     Thus, it does not appear the parties are too far apart on the funding issue.

84.     However, it is unclear, but according to counsel for the parties, it may take approximately a year for the IRS to approve or reject the Wholesale Plan.

85.     At this point, the Court can find no reason why Defendants should not immediately take all steps necessary to effectuate the Wholesale Plan even while it is pending before the IRS.   The Court's only concern is that certain steps may create adverse tax consequences, or may commit the Defendants to a funding mechanism that would become unworkable if IRS approval is ultimately not obtained.

86.     Therefore, it is the Court's inclination to order immediate, but staged,

funding in line with Plaintiff's suggestion – and not too inconsistent with Defendant's suggestion.

87.    However, because the Court is not altogether sure about potential adverse tax and related consequences, the Court would like to hear from the parties on that issue before making a final decision on immediate funding.

88.    To that end, the Court will order Defendants to submit a short brief on the potential adverse tax and related consequences of immediately funding the Wholesale Plan.

89.    Plaintiffs will then have an opportunity to respond.

90.    The Court also recognizes that Plaintiffs take issue with, and suggest some changes to, the Wholesale Plan as submitted to the IRS for approval.

91.    There is no question that the Wholesale Plan must ultimately provide the Plan participants with the benefits originally provided by the Plan.

92.    However, based on the limited evidence presented during trial about possible changes to the Wholesale Plan, the Court has not been provided with the evidence or arguments necessary to determine what, if any, substantive changes must be made to the Wholesale Plan.

93.    Plaintiffs' briefs and proposed findings of fact and conclusions of law do not give the Court a clear picture of how the current Wholesale plan should be

changed to comply with the original Plan and ERISA.

94.    Accordingly, the Court will also require Plaintiffs to provide the Court with a succinct list of their requested changes to the Wholesale Plan, why they are needed to fulfil the benefits promised in the original Plan, and why they are required by ERISA.  The list should not include any proposed changes which are not specifically needed to fulfill the benefits promised in the original Plan or to comply with ERISA.

95.    At the risk of redundancy, the Court will re-emphasize what it is requesting from Plaintiffs and what it will not consider:  The list must be succinct and to the point.  It must not include any kind of "wish list" of what Plaintiffs would like to see included in the plan.  Rather, it is to be strictly limited to a concise listing of the features in the Wholesale Plan which must be changed to provide the benefits promised in the original Plan or to comply with the requirements of ERISA.

96.    Defendants will then have an opportunity to respond.

97.    The Court will then hold a short hearing and issue a final decision on the funding issue and what, if any, changes should be made to the Wholesale Plan.

**Statutory Penalties**

Findings of Fact and Conclusions of Law and Order - 34

98.     A plan participant or beneficiary may bring a civil action for the relief under

ERISA Section 502(c). ERISA Section 502(a)(I)(A) (29 U.S.C.

§ 1132(a)(l)(A).

99.     Here, Plaintiffs seek relief for Defendants' failure to provide Summary Plan

Descriptions in conformance with the form and contents requirements of

ERISA § 102 (29 U.S.C. § 1022) and the regulations thereunder in

accordance with ERISA § 104(b)(1) (29 U.S.C. § 1024(b)(1)), Summary

Annual Reports under ERISA § 104(b)(3) (29 U.S.C. § 1024(b)(3), and

Participant Benefit Statements in accordance with ERISA § 105(a) (29

U.S.C. § 1025(a)).

100.    Plaintiffs made written demand for such documents within the parameters of

ERISA § 502(c)(l) (29 U.S.C. § 1132(c)(1)) by letter from Plaintiffs'

counsel to Defendants' counsel on October 26, 2007 and again on May 7,

2008 (Joint Ex. Nos. 7 & 8.)

101.    Any Administrator who fails to comply with a request for information which

the Administrator is required to furnish to a participant or beneficiary may

be liable for administrative penalties. ERISA § 502(c)(1) (29 U.S.C.

§ 1132(c)(1)).

102.    The award of administrative penalties is within the discretion of the Court.

**Findings of Fact and Conclusions of Law and Order - 35**

ERISA Section 502(c)(1) (29 U.S.C. § 1132(c)(1)).

103.  The Court is permitted in its discretion to award $100 per day per document per participant for the refusal to provide requested documents. ERISA § 502(c)(I) (29 U.S.C. § 1132(c)(l)),

104.  In determining the assessment of penalties "courts have considered various factors, including bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." *Devlin v. Empire Blue Cross*, 274 F.3d 76, 90 (2nd Cir. 2001) (Internal quotations omitted).

105.  Here, Defendants did not dispute or offer evidence that Plaintiffs did not request the documents or that they provided the documents to Plaintiffs.

106.  Instead, Defendants suggest that the particular circumstances of this case warrant the Court exercising its discretion against an award of penalties.

107.  The Court agrees.

108.  As explained in the Findings of Fact above, the original owners of Fearless established the Plan at some point during the 1980s.

109.  The Plan was not prepared by anyone with much or any knowledge of ERISA, and the only documents evidencing the Plan were certain letters and

memoranda distributed to Plan participants over the years, or in some cases placed in company files.

110.   The final written document evidencing the Plan was a two page letter describing the Plan and generally describing by example how a participant would qualify for benefits and how benefits in the form of retirement pay would be determined under the Plan. (Joint Ex. No. 4.)

111.   The former owners of Fearless purchased whole life insurance policies on the lives of participants in the Plan, but the Plan was otherwise unfunded.

112.   Fearless paid the premiums on those policies and those policies accumulated a cash surrender value.

113.   But the payments on those insurance policies lapsed at some point.

114.   Additionally, Plaintiffs' requests for information were not made until late 2007 and early 2008 while litigation in this matter was ongoing.

115.   As pointed out by Defendants,  Pursuant to federal discovery rules, Defendants provided Plaintiffs with all documents related to the Plan in the prior *Roberts* case, before the request for information was made.

116.   Accordingly, the Court concludes that Defendants did not act in bad faith in not providing the documents to Plaintiffs. *Devlin*, 274 F.3d at 90.

117.   Thus, although Defendants wholly failed to provide Plaintiffs with specific

**Findings of Fact and Conclusions of Law and Order - 37**

documents, in the context of this case no statutory penalties are warranted.

**Remedy if Wholesale Plan Rejected in Whole or in Part**

118.   The Court recognizes that the process for achieving approval of the Wholesale Plan from the IRS will likely take some time.

119.   Rather than issue a decision on what Defendants shall do if the Wholesale Plan is rejected, either in whole or in part, the Court will simply state that Defendants shall be required to find another mechanism to carry out their responsibilities to the Plan participants and/or their beneficiaries if the Wholesale Plan is rejected.

120.   Therefore, the Court will order equitable relief that the statute of limitations be tolled until 90 days after the IRS acts upon the VCP Application and Wholesale Plan, during which period either party may request a different court-ordered remedy.

**Attorney Fees**

121.   The Court may award attorney fees at its discretion.  ERISA Section 502(g) (29 U.S.C. § 1132(g)).

122.   The Court will consider the issue of attorney fees and costs upon motion of the parties timely submitted in accordance with the Federal Rules of Civil Procedures and Local Rules of the District of Idaho.

# ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiffs' claims under Counts I-III of the Amended Complaint shall be GRANTED as explained above, except as to Plaintiff Elliott.  Plaintiff Elliott's claims shall be DENIED.

IT IS FURTHER ORDERED that Plaintiffs' claims for statutory penalties under Count IV of the Amended Complaint shall be DENIED.

IT IS FURTHER ORDERED that Defendants Fearless, Stinker, Jones and Davis shall take the steps necessary, and consistent with the above Findings of Fact and Conclusions of Law, to fulfill their duties to the Plan participants under the Plan.  The Court recognizes that Defendants have begun that process by voluntarily filing the VCP application and Wholesale Plan with the IRS.  However, the Court issues this Order so that it is clear that Defendants are now under Court Order to fulfill their responsibilities.

IT IS FURTHER ORDERED that Defendants shall submit a short brief, not to exceed 10 pages, addressing whether and to what extent immediately funding the Wholesale Plan will cause adverse tax and related consequences, on or before **May 14, 2010**.  Plaintiffs shall file a short response brief, not to exceed 10 pages, on or before **May 21, 2010**.

IT IS FURTHER ORDERED that Plaintiffs shall provide the Court with a

succinct list of those changes to the Wholesale Plan which are needed to fulfill the benefits promised in the original Plan, and why they are required by ERISA, on or before **May 14, 2010**.   Defendants shall file a response on or before **May 21, 2010**.

IT IS FURTHER ORDERED that the Court will conduct a hearing on the briefs on **May 27, 2010 at 8:30 a.m.** in the United States Courthouse in Boise, Idaho.

DATED:  **April 26, 2010**



Honorable B. Lynn Winmill
Chief U. S. District Judge

**Findings of Fact and Conclusions of Law and Order - 40**